IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
SOUTHERN DIVISION

CINDY CARROLL                                                                    PLAINTIFF

v.                                                    CIVIL ACTION NO. _1:22cv23 TBM-RHWR_

POLARIS INDUSTRIES, INC. and
POLARIS SALES, INC.                                                         DEFENDANTS

**COMPLAINT**
**(JURY TRIAL DEMANDED)**

COMES NOW, Plaintiff Cindy Carroll, through counsel, and files this Complaint against

Defendants Polaris Industries, Inc. and Polaris Sales, Inc. (collectively, "Polaris"), and as grounds

states to the Court as follows:

**I.**

**PARTIES**

1.1     Plaintiff Cindy Carroll ("Plaintiff") is an adult resident citizen of Poplarville, Pearl

River County, Mississippi.

1.2     Defendant Polaris Industries, Inc. is a Delaware corporation, with its principal place

of business located at 2100 Highway 55, Medina, Minnesota, and is a citizen of Minnesota and

Delaware.

1.3     Polaris Sales, Inc. is a Minnesota corporation, with its principal place of business

located at 2100 Highway 55, Medina, Minnesota, and is a citizen of Minnesota.  Polaris Sales, Inc.

is a wholly-owned subsidiary of Polaris Industries, Inc., and on information and belief has the

same offices and same chief executive officer as Polaris Industries, Inc.  On information and belief,

Polaris Sales Inc. operates as an alter ego of Polaris Industries, Inc., and Polaris Industries, Inc. is

liable for all actions preformed in the name of Polaris Sales Inc.

## II.

## JURISICTION AND VENUE

2.1     This Court has diversity jurisdiction over this action under 28 U.S.C. §§ 1332(a) and (d) because it involves a controversy between citizens of different states and the amount in controversy exceeds the sum of $75,000.

2.2     Venue is proper in the Southern District of Mississippi, Southern Division, pursuant to 28 U.S.C. § 1391, because Polaris has marketed, advertised, sold, and leased vehicles within this district.

## III.

## INTRODUCTION

3.1     For almost a decade, Polaris has been the industry leader in off-road vehicle sales. In 2016, Polaris sold 480,000 off-road vehicles for net sales of $3.36 billion. Polaris's off-road vehicles include the popular Ranger and RZR lines.

3.2     The 2011-2014 RZR XP 900 series, 2012-2018 RZR 570 series, 2014-2018 RZR XP 1000 series, 2015-2018 RZR 900 and S 900 series, 2016-2018 RZR XP Turbo series, 2016-2018 General 1000 series, 2014-2018 Ranger XP 900 series, 2017-2018 Ranger XP 1000, 2014-2018 Ranger Crew XP 900, 2014-2018 Ranger 570 series, 2014-2018 Ranger 570 Crew series, 2017-2018 Ranger 500, 2017-2018 Ace 500, 2017-2018 Ace 570, and 2017-2018 Ace 900 all suffer from a design defect that creates a significant and unreasonable risk of the vehicles overheating and catching fire.

3.3      In fact, upon information and belief, since 2013, Polaris has recalled – at different times – all of the models referenced above because of fire hazards that have caused more than 250 fires, in excess of 30 severe injuries, and at least three deaths.

3.4     None of these recalls, however, addressed the root problem of the fire risk present in the above-referenced models, and have thus failed to remedy the risk for vehicle owners. Indeed, upon information and belief, some of the Polaris models that have been repaired pursuant to Polaris's ineffective recalls have nevertheless caught fire and otherwise continued to subject the general public, including Plaintiff, to acute safety risks.

3.5     Although Polaris has blamed multiple root causes for the fire risk in the models referenced above, it has failed to disclose the ultimate cause of the fire risk.

3.6     The true cause of the fire hazard is a design defect that is common to all of the Vehicles.  The Vehicles are equipped with an unusually high-powered "ProStar" engine that is tucked directly behind the occupant compartment.  The ProStar engine produces more power than the engines in competing vehicles as well as older and/or difference Polaris models and, accordingly, more heat.  The ProStar's exhaust gas piping routes forward toward the occupants, then turns 180 degrees, creating a U-shape, and exits from the rear.

3.7     The piping lacks proper ventilation and heat shielding, and is positioned within inches of combustible plastic body panels.  Thus, the hottest area of this high-performance engine is located inches behind the occupants, in an area of the vehicle that is enclosed with little room for air flow to dissipate the high heat.  The extremely high temperatures, combined with inadequate cooling and heat shielding, result in the melting of the plastic body panels and/or the electrical wiring, and the ignition of any combustible material surrounding the engine, including organic debris, leading to potentially deadly fires.  Hereinafter, this flawed design is referred to as the "Engine Overheat/Fire Defect."

3.8     Polaris introduced the high-performance ProStar engine in a center position over few years in all 500cc and larger models.  Every Vehicle has a ProStar engine located directly behind the occupant compartment.

3.9     As a cost-saving measure, Polaris designed the ProStar engine in-house rather than outsourcing.  Upon information and belief, the design process was rushed, and Polaris failed to take adequate time to design and test the engine and its new placement.

3.10    In hurrying the new ProStar equipped models to market, Polaris failed to install components necessary for safe operation, such as: adequate heat shielding in areas where plastic body panels sit mere inches from hot engine components, metal body panels in place of combustible plastic, electric cooling fans for engine heat removal and a more efficient closed cooling system.

3.11    At the same time, upon information and belief, Polaris was significantly increasing its sales and profits, and the accelerated pace and drive to maximize profit by reducing costs created systemic quality control issues that exacerbated the effects of the Engine Overheat/Fire Defect.

3.12    Upon information and belief, Polaris concealed from potential purchasers and/or failed to warn potential purchasers of the Engine Overheat/Fire Defect, and concealed that it has not developed an adequate, permanent fix for the defect.  Polaris is aware that the best fix is a significant redesign.  In absence of that, the ProStar equipped models will require an extensive combination of mitigating measures Polaris has not yet publicly revealed.  Instead, it has implemented several band-aide repairs that upon information and belief, even Polaris has now acknowledged are ineffective.

4

3.13    As a result of Polaris's unfair, deceptive, and/or other wrongful conduct, owners of the ProStar equipped models have suffered monetary loss and/or lost value and/or various injuries. Plaintiff suffered all three and has incurred substantial damages.

## IV.

## FACTUAL BACKGROUND

**A.      Polaris's Defective Engine and Engine Configuration**

4.1    Polaris first entered the off-road vehicle ("ORV") market in 1985 and produced its first Recreational Off-Road Vehicle ("ROV," also often referred to as a "side-by-side), the six-wheeled Ranger, in 1998.[1]  In 2000, Polaris unveiled the four-wheeled Ranger.[2]

4.2    Polaris introduced the Ranger RZR in 2007 (for Model Year 2008), as a smaller, more agile alternative to the utilitarian Ranger.[3]  Polaris subsequently shortened its name to RZR (hereinafter referred to as "RZR").

4.3    Ranger models are utility variants often used in commercial applications on farms, land managements, and for maintenance jobs, and an inability to use them can affect livelihoods. Vehicles include two-person and four-person Rangers models, all with a plastic cargo bed mounted directly above the engine.

4.4    Polaris's 2006 patent filing for a "Side-By-Side ATV" design, which became the Ranger RZR, was designed to reduce the width from the usual 54" to 50" (the term "ATV," or "All-Terrain Vehicle," is sometimes used interchangeably with the term "ROV").  Reducing the width was an important market advantage because the vehicles could move at an accelerated pace and could be loaded into the bed of a full-size pickup truck for transport. However, reduced width

---

[1] Polaris, 2014 Annual Report, Form 10-K, Dec. 31, 2014, at 4.
[2] *Id.*
[3] *Id.*

typically increases the risk of rollover, a significant problem with ROVs. Thus, Polaris's design attempted to mitigate the increased rollover risk associated with narrowing the width by lowering the engine position. To accomplish this width reduction, the patent disclosed a behind-the-seat engine location, rather than the previous under-the-seat location.[4]

4.5     The patent, which was granted in 2008, describes a narrower vehicle width and improved center of gravity. The patent disclosed as follows: "In this embodiment, engine is a 760 cc engine producing about 50 horsepower. Engine produces excellent acceleration characteristics and responsiveness. ATV weighs about 950 pounds and has a power to weight ratio of about 0.053/1. Any suitable engine may be used in ATV, and ATV may be constructed to any suitable weight, however the present invention contemplates ATVs having a power to weight ratio of at least 0.045/1."

4.6     The patent drawings depict the exhaust pipe exiting the engine on the right side of the engine bay and then up and toward the rear of the vehicle, away from the occupant compartment, resulting in a less obstructed air flow, as shown below:



4.7     When it debuted in 2007, the Ranger RZR had an engine configuration and offset placement that matched that described in this patent. Its top speed was 55 mph, its weight was 945

---

[4] U.S. Patent No. 7,819,220, "Side-By-Side ATV," filed Jan. 31, 2008.

lbs., and its power-to-weight ratio was .055, which was 44% higher than the competitor Yamaha Rhino.[5]  Compact size made it capable of navigating narrow trails. As Polaris describes it: "The new Ranger RZR delivers total Side x Side domination with its monstrous 800 Twin EFI. It's the only trail-capable Side x Side you can buy, going everywhere other Side by Sides can't.  With the fastest acceleration, the highest top speed, incredibly responsive handling, and all the utility you need, the Ranger RZR leaves all other Side x Sides in the dust."[6]

4.8     Polaris claimed its handling performance attributes were the result of its low center of gravity design: "The RANGER RZR and RZR S use a patented design that positions the engine behind the seat, creating the lowest center of gravity. It's like you're riding on rails, with razor-sharp handling and performance."[7]

4.9     Below is an image of this original, patented configuration on a RZR 800. The engine exhaust pipe is directed away from the occupant compartment and exposed to a relatively open wheel well:[8]



---

[5] Polaris Ranger 2008 Brochure, at 6.
[6] Polaris Ranger 2008 Brochure, at 8.
[7] Polaris Ranger 2009 Brochure, at 21.
[8] Product Review Polaris RZR 800, DuneGuide.com, http://www.duneguide.com/ProductReview_Polaris_RZR800.htm, accessed January 31, 2022.

4.10    In 2011, Polaris unveiled its new ProStar 900 Twin EFI engine, specifically designed for the RZR XP 900.  Polaris said the ProStar 900 engine "cranks out an industry-leading 88 HP and delivers 29% faster acceleration than the closest competitor."[9]  With a vehicle weight of 1,190 lbs., the new XP 900's power-to-weight ratio was bumped to 0.0739 – significantly more than originally envisioned with the patented behind-the-seat design.  The new engine "delivers fast throttle response, groundbreaking power and revolutionary acceleration."[10]

4.11    Upon information and belief, the ProStar engine was the first engine designed by Polaris engineers rather than by suppliers, as suppliers cost 20-30 percent more money and require more time to develop a custom engine.[11]  On its website, Polaris states: "A ProStar engine is an off-road vehicle engine that has been designed, engineered, and manufactured from the ground-up by the experts at Polaris who share the same passion for off-roading as you do.  ProStar engines are purpose-built, tuned, and designed specifically for your vehicle and application.  By leveraging cutting-edge technology from automotive influences, we have emerged as a trusted leader in off-road powertrain technology.  With over one million engines produced we've created the perfect balance of engineered features to ensure you are getting the maximum performance in every vehicle."[12]

4.12    The ProStar engine would eventually come in both twin-cylinder and single-cylinder and varying power outputs depending on the vehicle model. However, all models with the ProStar engine share a common engine and exhaust configuration.

---

[9] Polaris Ranger Brochure 2011, at 11.
[10] Polaris Ranger Brochure 2011, at 11.
[11] Polaris Indus., 2015 Annual Report, at 8.
[12] Polaris Indus. Website, ProStar Overview page, https://rzr.polaris.com/en-us/prostar/, accessed January 31, 2022.

4.13    Unlike the original behind-the-seat configuration with the engine exhaust ported on the right side, the ProStar engine was placed squarely behind the occupant compartment, with the exhaust pipe exiting forward toward the front of the vehicle and directly behind the occupant compartment.   The exhaust pipe quickly makes a 180-degree turn mere inches behind the passenger seating and seat belt buckles. The photographs below show this configuration from different angles in single-cylinder and twin-cylinder versions of the ProStar engine.[13]





---

[13] Long Term Report – The Polaris RZR 570, ATV & SXS Illustrated,
http://atvillustrated.com/content/long-term-report-polaris-rzr-570, accessed January 31, 2022.



4.14    The enclosed engine and exhaust pipe configuration in the Vehicles prevents airflow from dissipating the heat from the exhaust and nearby combustible materials.  The enclosed design prevents passive heat evacuation, whereby heat soak occurs, particularly at low speeds and under high load conditions, frequently experienced while traversing inclines.  The excessive heat melts the plastic sheeting that covers the engine and ignites surrounding combustible materials.

4.15    Compounding the problem, the ProStar engine was designed to allow easy access to components for maintenance.  This can be seen in the photos above, which show the pocket of space that provides access to the oil filter and spark plugs.  The gaps allow combustible organic debris to get caught under inadequate heat shields intended to box the exhaust heat in and away from passengers.  This debris can ignite as a result of the Engine Overheat/Fire Defect.

4.16    Upon information and belief, before Polaris installed the ProStar engine behind the occupant compartment, Polaris ROVs were not plagued by engine fires.  The only Polaris recall involving fire risk in the RZR was a 2007 recall of 330 model year 2008 RZR 800 vehicles for fuel tank could leaks, which according to Polaris had not caused any fires.[14]  Likewise the only

_____

[14] Polaris Indus., Recall No. 08-521, Dec. 6, 2007.

recall for fire risk in the Ranger vehicles was a 2009 recall of 3,800 model year 2009 Ranger Crew and 6x6 vehicles, concerning a risk of electrical shorting and fire in the rear tail light wiring harnesses.[15]

4.17    But two years after Polaris introduced the 2011 RZR XP 900 – the first model with the ProStar engine positioned on the centerline behind the occupant compartment – Polaris recalled the model because, "the firewall behind the driver and passenger seats can overheat and melt, posing a burn hazard to consumers."[16]   Like the recalls that would follow, Polaris advised customers to stop using the vehicles and bring them in for an unspecified repair.

4.18    In the recall announcement, Polaris reported there had been one report of burn injuries to a finger.[17]   However, at least one owner of a 2011 Ranger RZR XP 900 notified the CPSC that in 2012, he was driving the vehicle through the woods when he and his passenger smelled a burning smell.  Moments after they exited the vehicle, they observed a flame behind the seat, which "immediately began to spread and subsequently engulfed the entire [vehicle], until all that remained was the burnt out frame of the vehicle."[18]   When he contacted the dealer and Polaris in May 2012, prior to the recall, they offered him a $5,500 credit toward another purchase.[19]   Thus, upon information and belief, when it asserted in the recall that the firewall could melt and had only burnt a finger, Polaris concealed the fact that it was aware of at least one incident in which the entire vehicle burned in minutes.

---

[15] Polaris Indus., Recall No. 09-762, Aug. 4, 2009.
[16] Polaris Indus., Recall No. 13-740, June 19, 2013.
[17] *Id.*
[18] CPSC, Epidemiologic Investigation Report, Sept. 6, 2014, at 2.
[19] CPSC, Epidemiologic Investigation Report, Sept. 6, 2014, at 2.

4.19    Polaris marketing demonstrates the company was singularly focused on significantly exceeding the power output of its competitors' products at the expense of safety.   As Polaris learned of the Engine Overheat/Fire Defect associated with its new centerline ProStar engine configuration, it continued introducing models with the defective engine configuration. For example, in 2013, Polaris introduced the Ranger XP 900, which it touted as containing the new ProStar 900 engine that "pumps out 60 HP, with incredible class-leading torque across the power band.  All that power and torque lets you easily tow up to one ton, or haul up to 1,000 lbs."[20] At the same time, Polaris advertised, "[i]t's also a quiet ride, thanks to a new engine placement behind the seat and below the box.  Ground clearance is a high, obstacle-clearing 12".[21]

4.20    In 2014, Polaris debuted the RZR XP 1000, Ranger 900 and Crew 900, and Ranger 570 (the particular model at issue in this action) and Crew 570.   Each of these models contained a ProStar engine with the exhaust pipe placed in the center behind the occupant space.[22]

4.21    Likewise, in subsequent years, Polaris acted recklessly and without regard to safety by continuously increasing the power of its ProStar engines in the various models noted above.

4.22    By 2016, all RZR and all gas powered 500cc or larger Ranger models contained a ProStar engine.  Importantly, with the exception of the unique Youth RZR, all of the ROVs Polaris has recalled for fire risk since 2013 contain the ProStar engine directly behind the occupant compartment.  The Youth RZR has also been recalled for an isolated fuel system issue but does not appear to contain a ProStar engine.

4.23    The fire risk existing in the ProStar equipped models herein is severe.

---

[20] Polaris 2013 Off Roads Vehicles Brochure, at 5.
[21] *Id.*
[22] Press Release, Polaris Debuts New Products for 2014 Off-Road and Motorcycle Lines, July 31, 2013.

**B.      Polaris's Series of Ineffective Recalls**

**1.      RZR Recalls**

4.24      As discussed above, the first recall for the Vehicles was issued on June 19, 2013, recall number 13-740.  The recall involved 4,500 model year 2011 RZR XP 900 vehicles.  The specified cause: The firewall behind the driver and passenger seats could overheat and melt.

4.25      The April 2013 Technical Service Bulletin (TSB) explaining the recall to dealers provided more detail: "Some Ranger RZR XP 900 models may experience hot air leakage from the engine compartment that travels over the service divider panel which can cause deformation of the panel.  This hot air leakage into the passenger area can also create elevated air and component temperatures that could cause burns to the occupant of the vehicle.  Polaris has developed an aluminum heat shield to deflect the hot air and prevent it from damaging the service divider panel."[23]  The TSB noted that this safety bulletin updates a previous TSB issued in 2011 (R-11-03) that was completed through warranty claims, indicating that Polaris was aware of this problem two years before it issued the recall.

4.26      On October 5, 2015, Polaris issued recall number 16-702 for 53,000 model year 2015 RZR 900 series and RZR XP 1000 series vehicles.[24]  The cause stated in the recall notice was that the fuel vent line could be misrouted, causing it to become pinched. That in turn could overpressurize the fuel tank and leak fuel.  Polaris's press release noted that it had also received reports of the driveline contacting the pressurized fuel tank, which also caused fuel leaks.[25]  Polaris said it had received four reports of fuel leaks in the RZR 900 series, including two fires and one minor burn injury, and 25 reports of fuel leaks in the RZR 1000 series, with no fire incidents.[26]

[23] Polaris Indus., Tech. Serv. Bulletin R-13-02, Apr. 25, 2013, at 1.
[24] Polaris Indus., Recall No. 16-702, Oct. 5, 2015.
[25] Polaris Industries Recalls RZR Recreational Off-Highway Vehicles Due to Potential Fire Hazards, Oct. 5, 2015.
[26] Polaris Indus., Recall No. 16-702, Oct. 5, 2015.

13

4.27    What Polaris did not report in the recall was that in July 2015, a 15-year-old individual named Baylee Hoaldridge suffered burns over 65 percent of her body when the 2015 RZR 900 her family had rented tipped on its side and burst into flames.[27]   Hoaldridge died from complications a month after the recall was issued.[28]

4.28    When Polaris subsequently rolled this recall into another expanded recall, it provided more information that demonstrated the fuel vent problem was also related to the exhaust pipe's location.  In addition to the kinked fuel vent line, "[a]n improperly routed fuel tank vent line may have insufficient clearance to the exhaust head pipe.  A vent line with insufficient clearance to the exhaust head pipe may pose a fire hazard."[29]  Higher temperatures, such as those created by the Engine Overheat/Fire Defect, can also increase fuel tank pressure, exacerbating the danger posed by a pinched fuel line.

4.29    The specified "fix" did not actually resolve the fire risk.  On March 5, 2016, a fire started in a 2015 RZR XP4 1000 while a 19-year-old and 13-year-old were sitting in the occupant compartment.[30]   The fire engulfed the vehicle and burned it down to the metal chassis before help could arrive.[31]   The recall repair had been completed three months earlier.[32]   The CPSC report for the incident included photos:

---

[27] Caroline Connolly, Attorney for Family of Teen Girl Severely Burned in Crash Says Polaris Should Consider Vehicle Recall, Fox 13 Salt Lake City, Aug. 27, 2015.
[28] Jeffrey Meitrodt, Polaris Recalls 133,000 Off-Road Vehicles After Reports of Fire, Minneapolis Star Tribune, Apr. 19, 2016.
[29] Polaris Indus., Tech. Serv. Bulletin Z-16-01-AD, Apr. 19, 2016.
[30] CPSC, Epidemiologic Investigation Report, No. 160309CBB1457, Mar. 28, 2016.
[31] Id. at 3.
[32] Id. at 1.





4.30    On December 10, 2015, in recall number 16-713, Polaris recalled 2,230 model year 2016 RZR XP Turbo and RZR XP 4 Turbo vehicles, stating that the turbocharger's oil drain line could leak, posing a fire hazard.[33]   At that time, Polaris reported two reports of oil leaks and two reports of fire with no injury.  The turbocharged vehicles were first recalled only two months after they were released into the market.

4.31    This recall would be expanded to 13,000 turbocharged vehicles in September 2016, but this time the cause was connected to the Engine Overheat/Fire Defect: "The vehicle's engine can overheat and turbo system's drain tube can loosen."[34]   Polaris reported it had received 19 reports of vehicles catching fire, causing six burn injuries.  Polaris stated one of those incidents

---

[33] Polaris Indus., Recall No. 16-713, Dec. 10, 2015.
[34] Polaris Indus., Recall No. 16-257, Sept. 1, 2016.

involved a young child, a 6-year-old girl who was burned over 40 percent of her body when the RZR Turbo caught fire in Utah's American Fork Canyon, also setting fire to 15 acres of land.[35]

4.32     As depicted in the photo below, owners of vehicles repaired under this recall posted on online forums that the heat shield their dealer installed on the exhaust pipe to repair this recall had burned shortly thereafter.[36]



4.33     Realizing that the initial recall for the RZR 900 and 1000 series was inadequate, Polaris expanded the recall on April 19, 2016, to include a total of 133,000 vehicles: the 2013-2014 RZR XP 900 (production ended after 2014, when it became the RZR 900), 2014-2016 RZR XP 1000 (entire production to date), 2015-2016 RZR 900 (entire production to date), 2015-2016 RZR S 900 (entire production to date), 2016 RZR S 1000 (debut year).  Each of these vehicles had a ProStar engine mounted on the vehicle's centerline behind the occupant compartment.

4.34     Polaris did not specify a root cause on the recall notice, saying only the vehicles "can catch fire while consumers are driving, posing fire and burn hazards."[37]  Polaris reported it had received 160 reports of fires with just those vehicles and 19 injury reports, including some for

---

[35] Jed Boal, Recent ORV Explosion Raises Questions About Vehicle's Safety, KSL.com, Jul. 26, 2016, https://www.ksl.com/?sid=40821427&nid=148, accessed January 31, 2022.
[36] RZR Forums.Net, 16 Turbo with Recall done heat shield allegedly burning, Sept. 24, 2016, http://www.rzrforums.net/rzr-xp-turbo/336465-16-turbo-recall-done-heat-shield-allegedly-burning.html, accessed January 31, 2022.
[37] Polaris Indus., Recall No. 160146, Apr. 19, 2016.

third degree burns.[38]  Inexplicably, Polaris still did not include Baylee Hoaldridge's death in the tally.

4.35    According to the TSBs Polaris sent to dealers for this recall, the vehicles had one or more of several issues related to overheating and fire.  Every recalled vehicle also had the engine configuration associated with the Engine Overheat/Fire Defect.

4.36    In a press release, Polaris stated it had "already begun implementation of its Corrective Action Plan and has made manufacturing updates in new-production vehicles.  Polaris also plans to include a warning on new-production vehicles instructing riders not to carry fuel and other flammable liquids in their vehicles, and cautions against carrying flammable liquids in previously produced models."[39]

4.37    Polaris's Chairman and CEO Scott Wine assured the public, "[w]e are working day and night to inform our customers and dealers and to obtain the parts needed for the repairs we identified in our comprehensive analysis.  We apologize for the inconvenience to our customers as we work to ensure all the systemic thermal risks we identified are eliminated from our vehicles."[40]

4.38    However, on March 2, 2017, Polaris again expanded on previous recalls, re-recalling 13,500 model year 2016 vehicles that had already been recalled meaning that those fixed under the expansive April 2016 recall still suffered from the Engine Overheat/Fire Defect, and adding model year 2017 for certain vehicles in the RZR 900 series, RZR XP 1000, and RZR XP 4 Turbo.  It also added the 2016-2017 General 1000 and General 4 1000.[41]   Like the others, the

---

[38] *Id.*
[39] 44 Press Release, Polaris Industries Voluntarily Recalls Certain RZR 900 and 1000 Off-Road Vehicles, Apr. 16, 2016.
[40] *Id.*
[41] Polaris Indus., Recall No. 17-102, Mar. 2, 2017.

recall for the General 1000 series encompassed its entire production run. All recalled vehicles featured the ProStar engine behind the occupant compartment.[42]

4.39    This recall stated that the engine could misfire, causing the exhaust to overheat, melting nearby components.[43]   Polaris received one report of fire and two reports of melting related to engine misfire.[44]

4.40    Finally, on December 19, 2017, Polaris and CPSC issued a joint statement warning the public that fires in the 2013-2017 RZR 900 and 1000 vehicles had caused death, serious injuries, and property damage.[45]   The warning noted that many of the vehicles were previously recalled, "[h]owever, users of the vehicles that were repaired as part of the April 2016 recall continue to report fires, including total-loss fires."[46]   The warning also stated that some of the 2017 RZR vehicles not previously recalled have also experienced fires.[47]

4.41    The joint statement offered no solution, saying only that "[t]he CPSC and Polaris continue to work together to ensure fire risks in these vehicles are addressed.  However, at this time, the CPSC and Polaris want to make the public aware of the fires involving these vehicles."[48]

4.42    The RZR recalls did not stop there.  Three days after the joint CPSC and Polaris announcement, the fire hazard was associated with model year 2018 vehicles, with Polaris recalling 560 RZR XP 4 Turbo vehicles for a risk of fire.[49]   Polaris had received one report of fire related to this flaw.[50]

---

[42] Polaris General 1000 EPS: Full Test, UTV Action, Apr. 8, 2016, https://utvactionmag.com/polaris-general-1000-eps-full-test/, accessed January 31, 2022.
[43] Polaris Indus., Recall No. 17-102, Mar. 2, 2017.
[44] Id.
[45] Joint Statement of CPSC and Polaris on Polaris RZR 900 and 1000 Recreational Off-Highway Vehicles (ROVs), Dec. 19, 2017.
[46] Id.
[47] Id.
[48] Id.
[49] Polaris Indus., Recall No. 18-708, Dec. 21, 2017.
[50] Id.

4.43    On April 2, 2018, Polaris issued yet another recall related to the Engine Overheat/Fire Defect.  The recall applies to 107,000 model year 2014-2018 RZR XP 1000 vehicles in which the exhaust silencer fatigues and cracks and the heat shield fails to manage the heat, leading to melting of nearby components or fire.[51]   Some RZR owners have noted on a forum that the intense heat from the engine was what was causing the exhaust silencer, also known as a muffler, to crack on the side facing the engine.[52]

4.44    The same day, Polaris announced another voluntary field action for the 2017- 2018 RZR 570, 2016-2018 RZR S 1000, 2016-2018 RZR XP/XP 4 Turbo, and 2017-2018 Ace 500, 570, and 900 models.  The Ace is a one-seat side-by-side vehicle that shares many characteristics of an ATV.  The 2017-2018 Ace vehicles contained a ProStar engine with the exhaust pipe in the same configuration as the other models.   This time, Polaris said the vehicles contained a fuel pump flange assembly that could degrade when exposed to certain chemicals over time, resulting in a fuel leak that could catch fire in the presence of an ignition source.  Polaris's solution is reportedly to install a cover over the fuel pump to protect it from chemical exposure, suggesting Polaris used an inadequate material for the assembly within an unforgiving environment. [53]

4.45    Although Polaris has admitted to a fire risk in its recalls, it has never disclosed to potential consumers that all of the recalled vehicles share the underlying Engine Overheat/Fire Defect and that Polaris has not devised a viable repair to remedy this defect.   Instead, it has hidden behind a series of band-aide fixes for issues that would not be causing fires were it not for the excessive heat generated by the Engine Overheat/Fire Defect.

---

[51] Polaris Indus., Recall No. not provided, Apr. 2, 2018.
[52] RZRForums.Net, posted by JGKopp, Fuel rail causing fires?, post no. 62, Jan. 26, 2016, available at http://www.rzrforums.net/rzr-xp-4-1000/183116-fuel-rail-causing-fires-5.html.
[53] Polaris Indus., Polaris Issues Voluntary Field Action for Certain RZR and ACE Models, Apr. 2, 2018.

4.46   In sum, all RZR models with the centerline-mounted ProStar engine have been recalled, several for all model years produced.  Prior to the incorporation of the centerline-mounted ProStar Engine, only 330 total RZR vehicles had been recalled.

## 2.   Ranger Recalls

4.47   At the same time the series of RZR recalls was unfolding, the Ranger vehicles with ProStar engines in the central location were also recalled several times.

4.48   In June 2016, Polaris recalled 43,000 model year 2015-2016 Ranger 570 and Crew 570 series vehicles.  The U.S. recall stated that the ROVs could overheat during heavy engine loading, slow-speed intermittent use and/or high outdoor temperatures, causing them to catch fire.[54]  However, Canada's recall statement explained that the culprit was that the excessively hot exhaust system in a confined space with little air flow could set the seat close-off panel on fire.[55] The remedy was a new heat shield between the engine exhaust and the seat panel.[56]   Polaris had received 36 reports of fire, including three minor burns and one sprained ankle associated with escaping the burning vehicle.[57]

4.49   In September 2016, Polaris recalled 42,500 model year 2014 Ranger XP 900 and Crew 900, stating it had received 36 reports of fire, including three minor injuries.[58]  The TSB for this recall specified that the fasteners for the cargo box heat shield could become loose, failing to protect the passenger seat panel from exhaust heat.[59]

---

[54] Polaris Indus., Recall No. 16-755, June 28, 2016.
[55] Canada Recall and Safety Alerts No. 2016326, June 27, 2016.
[56] *Id.*
[57] Polaris Indus., Recall No. 16-755, June 28, 2016.
[58] Polaris Indus., Recall No. 16-264, Sept. 16, 2016.
[59] Polaris Indus., Tech. Serv. Bulletin R-16-03, Sept. 15, 2016.

4.50    In April 2017, Polaris expanded the 2016 recall to include model year 2015 after receiving 13 incident reports, including five fires.[60]  This expanded recall asserted that the heat shield could fall off the vehicle.  Owners report the heat shields are coming off because the metal attaching bolts are hearing up to the point that they melt the plastic panel to which the shields are attached.[61]

4.51    Polaris has not recalled model years 2013 or 2016 for the Ranger XP 900, which share the ProStar engine configured in the same manner as the other model years, but owners of these vehicles have warned others via user forums of the hazards.  In 2013, a firefighter posted a warning on a forum under the subject heading, "2013 polaris ranger 900 xp exhaust FIRE danger," saying after he purchased the vehicle, he and his fellow firefighters discovered that in the "new Polaris setup the muffler gets really hot."  That is a danger because of "the vehicle's exhaust and muffler placement," as well as the fact that "a majority of the muffler is open and could easily start a grass fire if not watched carefully by the operator, especially when stopping in long dry grass or brush."[62]  Unfortunately, warnings posted on forums are often read only after a current owner visits the site looking for answers to problems that are already occurring.

4.52    Another consumer posted in November 2016 that his new 2016 Ranger XP 900 had caught fire only three days after he purchased it after mud and straw ignited on the engine.  The consumer reported, "I am choked.  I have used this brand new item for 1.5 working days since Nov. 9.  The dealer and Polaris see me as 'overreacting,' and I can't get Polaris to contact me."[63]

---

[60] Polaris Indus., Recall No. 17-132, Apr. 13, 2017.
[61] PRCForum.com, posted by Chris, 2014 900 potential fire issue, June 22, 2015, available at http://www.prcforum.com/forum/26-ranger-problems-solutions/61961-2014-900-potential-fire-issue.html
[62] PRC Ranger Club, 2013 Polaris Ranger 900 xp exhaust FIRE danger, July 26, 2013, http://www.prcforum.com/forum/154-ranger-xp-900-570-fs-discussions/50505-2013-polaris-ranger-900-xp-exhaust-fire-danger.html, accessed January 31, 2022.
[63] Ranger Forums, XP 900 on Tracks Major Problems, by Frankie Paper Boy, Nov. 23, 2016, http://www.rangerforums.net/forum/polaris-ranger-xp900/30402-xp-900-tracks-major-problems.html,       accessed January 31, 2022.

4.53     Polaris tells Ranger owners that only a dealer can conduct the replacement repairs. Many Ranger owners use their vehicles as utility vehicles on farms or other remote locations, with dealerships miles away.  For example, one forum user who has a 2015 Ranger XP 900 stated, "[a]ccording to my dealership, which is 90 miles away, I need to return it there and can't do the work myself.  He also stated that if it caught fire while riding it, neither Polaris nor my insurance company would be liable.  I'd be on the hook for damages myself."[64]

4.54     Thus, Ranger owners whose vehicles have been recalled are also forced to make the decision between taking time to deliver the Ranger to a dealership, possibly leaving it there for days while waiting for the repair, or use a vehicle that could catch fire while they are using it.

4.55     Polaris's representations to owners of recalled Rangers that the vehicles have a discreet, permanent fix, i.e. new heat shields, conceals its knowledge that the vehicles will continue to possess the underlying Engine Overheat/Fire Defect, and that Polaris has attempted since 2011 to devise a heat shield effective enough to withstand the excessive temperatures, but has continually had to recall the heat shields it selects.

4.56     Polaris has also concealed the Engine Overheat/Fire Defect from owners of Ranger vehicles that have not yet been recalled, giving them the false impression their vehicles are safe from fire risk.

4.57     On April 2, 2018, the CPSC confirmed Polaris's duplicity, fining the company a record $27.25 million for failing to timely report defects and fire hazards in the RZR and Ranger

---

[64] Ranger Forums.Net, 2015 XP900 Recall Notice, Apr. 24, 2017, http://www.rangerforums.net/forum/polaris-ranger-xp900/35433-2015-xp900-recall-notice.html,         accessed     on January 31, 2022.

models that it knew could result in serious injury or death.[65]   Neither the CPSC's nor Polaris's press releases announcing the fine mentioned the unsolved defect situation with the RZR vehicles.

## C.   Polaris's Meteoric Rise Causes Systematic Quality Control Problems

4.58    During the timeframe the engines were designed and manufactured, Polaris sales skyrocketed, leading to dangerous cost-cutting measures, which were also imposed on its suppliers.   The rapid pace at which Polaris wanted to unveil new vehicles also meant the component design, engineering, and testing process was truncated, which, upon information and belief, resulted in inadequate component validation testing.

4.59    These systemic quality control issues and the relentless drive to reduce costs was part of a culture that put profits above safety.   Upon information belief, quality control problems and lack of oversight over suppliers exacerbated the Engine Overheat/Fire Defect by subjecting subpart components to the excessive heat environment.

4.60    From at least the mid-2000s until 2015, when it implemented a new cost reduction program, Polaris expected suppliers to participate in what it called the Strategies Toward Annual Reductions, or STAR, program.  In a STAR Program Manual to suppliers, Polaris stated that, "[i]n order for Polaris to maintain and improve its competitive position, cost reduction efforts need to do more than offset inflation."[66]   Polaris challenged suppliers to submit cost savings proposals equal to at least 10 percent of their annual sales and to work with Polaris to actually implement cost savings of at least 2 percent of annual sales.[67]

---

[65] CPSC, Press Release, Polaris Agrees to Pay $27.25 Million Civil Penalty for Failure to Report Defective Recreational Off-Road Vehicles, Apr. 2, 2018.

[66] Polaris Indus., Supplier STAR Program Manual, updated Jan. 15, 2003, at 2, available at https://www.polarissuppliers.com/Polcy_Procedure/STAR/S001.asp

[67] Polaris Indus., Supplier STAR Program Manual, updated Jan. 15, 2003, at 2, available at https://www.polarissuppliers.com/Polcy_Procedure/STAR/S001.asp

4.61     The STAR Program manual noted, "Although the emphasis of this program is to achieve bottom-line savings, suppliers are reminded that this is a cost reduction program and not simply an invoice price reduction initiative.  Suppliers are encouraged to reduce costs by focusing on any and all saving opportunities . . . ."[68]  These cost reductions could be in the form of, for instance, reductions to operating or material costs, including recommending cheaper alternate materials, and design changes for existing products, such as "relaxing a tolerance to reduce scrap and increase throughput."[69]

4.62     If not carefully validated, cost reductions can have a significant impact on safety. A manufacturer could, for instance, approve thinner walls for fuel tanks to save money on plastic, making them more prone to failure in high-heat conditions, or select less expensive bolts prone to shearing.

4.63     Polaris credited these cost reductions as a significant factor in its massive increase in profits.  For instance, in its 2011 10-K, Polaris reported, "[f]or 2011, gross profit dollars increased 40 percent to $740.6 million compared to 2010.  Gross profit, as a percentage of sales, increased 130 basis points to 27.9 percent compared to 26.6 percent for 2010.  The increase in gross profit dollars and the 130 basis points increase in the gross profit margin percentage in 2011 resulted primarily from continued product cost reduction efforts, production efficiencies on increased volumes, and higher selling prices, partially offset by increasing commodity costs and unfavorable product mix."[70]

---

[68]  Polaris Indus., Supplier STAR Program Manual, updated Jan. 15, 2003, at 2, available at https://www.polarissuppliers.com/Polcy_Procedure/STAR/S001.asp
[69]  Polaris Indus., Supplier STAR Program Manual, updated Jan. 15, 2003, at 3, available at https://www.polarissuppliers.com/Polcy_Procedure/STAR/S001.asp
[70]  Polaris Indus., 2011 Annual Report, SEC Form 10-K for fiscal year end Dec. 31, 2011, at 34.

4.64    The cost reduction efforts were particularly important as Polaris readied itself to become the world leader in recreational vehicles.  One cost-cutting measure Polaris took in 2009 was to begin designing and manufacturing its own engines.  In its 2015 Annual Report, Polaris explained the reasons for this evolution: "Lower cost – Suppliers typically charge 20 to 30 percent more to develop a custom engine than it costs to do it in-house. Faster time to market – A custom engine from a supplier typically takes four to five years to develop, an unacceptable timeline for a competitive company."[71]

4.65    Polaris also explained that developing an engine in-house provides "[t]he flexibility to be more innovative – We can experiment more cost-effectively with radical ideas that help exceed customer desires."[72]

4.66    In developing its own engine, "[w]e borrowed a page from our chassis playbook and developed five platforms that serve as the foundation for all our engines. While each engine has its own distinct brand variances, they share some common elements to maximize our powertrain investment."[73]

4.67    Thus, Polaris appears to have begun developing the ProStar engine in 2009 and installed it in the first vehicle, the 2011 RZR XP 900, only two years later.

4.68    In its 2009 Annual Report, Polaris highlighted several changes implemented that year to reduce costs: "The Operational Excellence initiatives in engineering drove two critical outcomes in 2009 – cost improvement in all areas and quality improvement in most areas.  From a cost improvement perspective, engineers implemented design changes that allowed them to use more common components and subsystems across multiple Polaris platforms.  They leveraged

---

[71] Polaris Indus., 2015 Annual Report, at 8.
[72] Polaris Indus., 2015 Annual Report, at 8.
[73] Polaris Indus., 2015 Annual Report, at 9.

commonalities in drivetrains, chassis, electrical subsystems, body frames and controls to drive significant savings across the portfolio of products.  Polaris engineering teams reduced cycle time for product design by nearly 50 percent and discovered new ways to reduce the weight of most vehicles.  And they found ways to make manufacturing processes faster and less labor-intensive, which also had a strong impact on costs and margins."[74]

4.69    The 2009 recession prompted Polaris to declare 2010 the year of "Making Growth Happen," which it planned to accomplish by "leveraging our industry-leading innovation, speed to market and burgeoning international presence."[75]   That year, Polaris experienced a 27 percent sales increase, requiring ramped up production, a new assembly line in Mexico, and enhanced U.S. facilities to lower production costs and manufacturing lead times.[76]   The company set a goal of reaching $5 billion in worldwide sales by 2019.[77]   Products that used to take six months to manufacture were now produced in as little as two weeks because representatives were meeting with dealers frequently to discuss sales and demand, rather than requiring that dealers guess what to stock.[78]   In its first year of operation, the Monterrey, Mexico facility alone produced 22,000 vehicles.[79]

4.70    By 2011, Polaris was making 24 models of ORVs, including Sportsman ATVs (themselves the subject of a fire-hazard class action lawsuit).[80]   The goal to reach $5 billion in sales was shortened from 2019 to 2018.[81]

---

[74] Polaris Indus., 2009 Annual Report, at 9.
[75] Polaris Indus., 2010 Annual Report, at 1.
[76] *Id. at 2.*
[77] *Id.*
[78] *Id. at 4.*
[79] Polaris Indus., 2011 Annual Report, at 10.
[80] Polaris Indus., 2011 Annual Report, Securities Form 10-K Filing, at 16.
[81] *Id. at 1.*

4.71    The rapid growth continued in 2012, with Polaris emphasizing the thirst for growth at a rapid pace in its Annual Report: "Regardless of the challenges, the success of Polaris ultimately depends on leadership and teamwork.  We have a deep and talented team that is the best in powersports, and we rely on their experience and ability as we expand into new markets.  Our ability to innovate and execute faster and better than the competition provides Polaris with an advantage that plays anywhere; couple that with the global reach of our strong brands and the potential of our business is practically unlimited.  This Polaris team has aggressively and consistently executed our Strategic Objectives to create both value for shareholders and significant opportunities for additional growth."[82]  In a 2012 presentation to investors, Polaris projected a 120 percent sales growth for the RZR brand between 2009 and the end of 2012.[83]

4.72    In its 2013 report, Polaris proclaimed that its sales had risen so much it had expanded its sales goal to $8 billion by 2020.[84]  In that year alone, it launched 26 new models, bringing the total ORV models to 49 (double the number of models in 2011).[85]  Polaris credited its margin reductions, stating, "However, one simple number – 10.1 percent – best represents the progress we've made over the past five years.  In 2009, we set a goal to expand net income margin from 6 percent to 10 percent by 2018.  With typical Polaris vigor, our teams relentlessly pursued margin opportunities: they moved plants and lowered product costs, improved productivity and leveraged overhead, value engineered vehicles, and captured price."[86]

---

[82] Polaris Indus., 2012 Annual Report, at 4.
[83] Polaris Indus., Analyst & Investor Meeting, July 31, 2012, at 60.
[84] Polaris Indus., 2013 Annual Report, at 3.
[85] *Id.*; *see also* Polaris Indus., 2014 Annual Report, Securities Form 10-K Filing, at 30.
[86] Polaris Indus., 2013 Annual Report, at 6.

4.73    But there were signs that Polaris knew the pace might be affecting design and quality, as Polaris stated in its Annual Report: "Achieving our net margin goal five years early, in conjunction with our accelerated revenue growth, coincides nicely with the exponential expansion our market capitalization has undergone.  While we're certainly pleased with our progress, there are clear justifications for our intense motivation to be better: we must improve project execution, quality and speed; lower inventories and warranty costs; and generate significant returns on numerous investments that have, in some cases, diluted our margins over the past few years."[87] The report also stated that the "financial results were arguably better than our operational performance" and "less-than-stellar execution."[88]

4.74    To address some of those concerns, in 2014, Polaris created the division for Operations, Engineering and Lean [Management].  The executive vice president of this division, Ken Pucel, said he was brought in to "make sure we not only drive industry-leading innovation, but that we also drive continuous improvement and efficiency and quality and safety and keep up with product demand."[89]  To improve operations, Polaris was "better integrating engineering and manufacturing.  We're involving manufacturing experts earlier in the development process and involving engineering experts further into manufacturing and supply chain."[90]  CEO Scott Wine said in the report that in its drive to reach $8 billion in sales by 2020, Polaris planned to reduce supplier costs, rework (i.e. correcting defective products), and inventory.[91]

---

[87] Polaris Indus., 2013 Annual Report, at 2.
[88] *Id.* at 4.
[89] Polaris Indus., 2014 Annual Report, at 18.
[90] *Id.*
[91] Polaris Indus., 2014 Annual Report, at 8.

4.75    Sales in ORVs declined in 2015, Polaris proclaimed an "all-out assault on costs." As part of this renewed focus on cost reduction, Polaris replaced the STAR program with the Value Improvement Project (VIP) system.  The company implemented this system because, according to a presentation to suppliers by Tony Wixo, then Senior Director of Global Procurement and Supplier Development, "traditional cost-down approaches won't meet the goals we have for margin expansion coupled with business growth."[92]  Wixo said VIP was a standardized tool with a "common prioritization across groups driven by financials."[93]  Polaris wanted to use VIP to reduce material costs, which account for 78% of the company's costs through Value Analysis/Value Engineering (VA/VE), which is a method for determining the highest costs and eliminating them; focused optimization and in-sourcing; and strategic sourcing with "should cost" modeling.[94]

4.76    Under the VIP program, Polaris still insisted on a 2 percent or better annual net cost reduction, but only suppliers who achieved a 6 percent or greater cost reduction would be given the highest grade for cost reductions, which counted for 30 percent of the overall grade.[95]

4.77    Polaris's 2015 Annual Report hints at its recognition that quality was suffering: "Quality and Delivery must also improve as we progress along our Lean journey. While an important commitment will always be to build the best vehicles, we know that winning in the future will require more than horsepower and suspension travel.  With our multi-year global investment in assembly plants in its final stages – from Spirit Lake and Opole all the way to Jaipur

---

[92] Polaris Indus., 2016 Supplier Conference, General Session – Global Procurement – Strategic Sourcing & Supplier Management, Feb. 2016, at 9.
[93] *Id.*
[94] Polaris Indus., 2016 Supplier Conference, General Session – Global Procurement – Strategic Sourcing & Supplier Management, Feb. 2016, at 10.
[95] Polaris, Supplier Business Practice Manual, 2018, at 19, available at https://www.polarissuppliers.com/polcy_procedure/Business_Practices/BP001.asp.

and Shanghai – we are prepared to deliver higher-quality vehicles and shorter lead times to customers all over the world."[96]

4.78    After recalling more than 200,000 RZR and Ranger vehicles for fire hazards in 2016, Polaris, in its Annual Report, promised that the company was improving its engineering and quality: "As Polaris has always done, we attacked our problems head-on and learned a great deal as we addressed them.  We are putting that knowledge to use as we continue to strengthen our Global Safety and Quality function.  Safety and quality have been, and remain, our top priorities, but we know we still have much work to do.  We will continue to closely monitor our vehicles' performance.  When an issue arises, we will act swiftly to keep our customers safe."[97]

4.79    Polaris also asserted it was "increasing our R&D investment significantly, adding engineering resources to ensure that our armada is stronger than ever before.  With stronger leadership, increased investments, more resources, improved dealer service and support, and of course, great vehicles, we are well-prepared to deliver better performance in a competitive ORV market."[98]

4.80    The Annual Report included a description of the goals of the Global Safety and Quality Organization: "enhanced and monitor quality systems across the entire product lifecycle – from product and supplier development through manufacturing and end of life. Enhanced and monitor safety training for all employees.  Conduct post-sale surveillance, tracking warranty data and social media to identify and address safety trends sooner."[99]

---

[96] Polaris Indus., 2015 Annual Report, at 2.
[97] Polaris Indus., 2016 Annual Report, at 3.
[98] *Id.* at 4.
[99] *Id.* at 11.

4.81     Polaris's assertions of a renewed focus on quality are belied by its requirements of its suppliers, which are significantly less stringent than most manufacturers.

4.82     Polaris states in its Supplier Quality Assurance Manual (SQAM) that suppliers must "strive to create a 'zero-defect' environment in which ongoing data review shall drive proactive process improvements."  The latest SQAM version seems mindful that its oversight was previously lacking: "We shall transform our mindset regarding quality from 'as received' at the factory to zero defects 'as delivered' to the end customer. The focus shall be on customer-perceived quality with metrics linked to leading product quality and reliability."[100]

4.83     However, in its Supplier Business Practices Manual, Polaris describes its monthly grading system for suppliers, which is based on delivery and flexibility, quality, and cost reductions.  Quality, which accounts for 30 percent of the grade, is judged primarily by a supplier's Parts Per Million (PPM) performance basis, which is a measure of how many defective parts were produced within one million parts.[101]  Polaris's minimum quality expectation is that suppliers will attain a PPM below 300, although a PPM under 500 will not prompt a quality alert.[102]  In a 2017 supplier conference webinar, Wixo noted that Polaris's goal was less than 225 PPM.[103]  This translates to an acceptance rate of 225 defective parts out of one million parts produced.

4.86     Polaris's acceptable PPM is significantly higher than the rate considered acceptable in manufacturing.  Many manufacturers follow Six Sigma quality practices, which allows only 3.4

---

[100] Polaris, Supplier Quality Assurance Manual, March 2018, Rev. 4, at 6; Captured 06/08/18 at:
https://www.polarissuppliers.com/Files/Polcy_Procedure/Documents/Supplier_Exchange/SQAM%20Rev4.pdf.
[101] Polaris, Supplier Business Practices Manual, 2018, at 16, available at
https://www.polarissuppliers.com/Polcy_Procedure/Documents/Supplier_Exchange/SupplierBusinessPracticeManua
l.pdf.
[102] Id. at 17.
[103] Polaris Indus., 2016 Supplier Conference, General Session – Global Procurement – Strategic Sourcing &
Supplier Management, Feb. 2016, at 14, available at
https://www.polarissuppliers.com/files/Conference/Tony%20Wixo%20General%20Session%20Presenation.pdf.

defects per million parts produced.[104]   In fact, Polaris specifically requires in its SQAM that suppliers adhere to Six Sigma.[105]   Yet, it is willing to accept 221.6 defective products over that limit.

4.87   By way of illustration, the high-profile 2001 recall of Bridgestone/Firestone Wilderness AT tires on Ford vehicles had an average tread separation claims rate of 9 PPM.[106] The lesser known 2010 recall of Garmin International portable GPS units for fire risk was issued after a defect rate of only 6.67 PPM.[107]

4.88   Thus, despite years of recalls, Polaris continues to violate both its internal quality standards and accepted industry quality practices, exacerbating the effects of the undisclosed Engine Overheat/Fire Defect to the detriment of Class Members.

4.89   Plaintiff had no way of discovering through the exercise of reasonable diligence that her Polaris Ranger 570 was defective until after suffering her damages and injuries, particularly because Polaris never issued a recall for the 2014 Ranger 570 despite its ProStar engine and its manner of design, as explained above.

4.90   Further, at all times relevant, Polaris has concealed from and failed to disclose to Plaintiff vital information concerning the Engine Overheat/Fire Defect described herein.

4.91   Indeed, at all times relevant, Polaris kept Plaintiff ignorant of vital information essential to the pursuit of her claims.   As a result, Plaintiff could not have discovered the design defect explained herein, even upon reasonable exercise of diligence.

---

[104] Roger G. Schroeder et al., Six Sigma: Definition and Underlying Theory, 26 Journal of Operations Management 536 (2008), at 537.
[105] Polaris, Supplier Quality Assurance Manual, March 2018, Rev. 4, at 6; Captured 06/08/18 at: https://www.polarissuppliers.com/Files/Polcy_Procedure/Documents/Supplier_Exchange/SQAM%20Rev4.pdf
[106] See Joint Hearing, Subcommittees on Commerce, Trade, and Consumer Protection, Ford Motor Company's Recall of Certain Firestone Tires, June 19, 2001, at 95.
[107] Nat'l Highway Traffic Safety Admin., Recall No. 10E039, Garmin International, Aug. 10, 2010, at 2.

4.92     Specifically, Polaris was aware that the 2014 Ranger 570 was susceptible to catching fire, and that it contained the Engine Overheat/Fire Defect.

4.93     Despite its knowledge of the defect, Polaris failed to disclose and concealed, and continues to conceal, this critical information from Plaintiff, even though at any point in time, it could have done so through individual correspondence, media release, or by other means.  Indeed, Polaris affirmatively concealed the Engine Overheat/Fire Defect through its series of ineffective and misleading recalls, described above, and never even issued a recall for the 2014 Ranger 570.

4.94     Plaintiff justifiably relied on Polaris to disclose the Engine Overheat/Fire Defect in the 2014 Ranger 570 that Plaintiff purchased, because that defect was hidden and not discoverable through reasonable efforts by Plaintiff.

4.95     Moreover, Polaris was under a continuous duty to disclose to Plaintiff the true character, quality, and nature of her 2014 Ranger 570.

4.96      Polaris knowingly concealed the true nature, quality, and character of the 2014 Ranger 570.

## V.

## FACTS SPECIFIC TO PLAINTIFF'S DAMAGES AND INJURIES

5.1     In or about July of 2014, Plaintiff purchased the 2014 Polaris Ranger 570 side-by-side at issue (Prostar Engine; Body Type: RGR-14, 570, S. Green, HDPE; Model: R14RH57AA; VIN: 4XARH57A6EE224077) (hereinafter, "Subject Ranger 570").

5.2     On January 31, 2019, due to the Engine Overheat/Fire Defect described herein, the Subject Ranger 570 suddenly and without warning caught fire while parked in the garage of a home owned by Plaintiff located at 377 Sam Smith Rd., Poplarville, MS 39470-7379.  The fire totally destroyed the home owned by Plaintiff.

5.3     At the time when the fire loss occurred, the Subject Ranger 570 was parked in a large double garage with roll down doors, which were open at the time.  The garage was very open and very clean, and no fuel or other incendiary material was stored in the garage.  In addition, the garage did not include a hot water heater nor any appliances.  Nothing in the garage was plugged into an electrical outlet (only a weed eater charger was located in the garage, but it was not plugged in at the time of the fire).

5.4     At the time of the fire, the Subject Ranger 570 had been driven a short distance and then parked in the garage while Plaintiff's mother ran to town for approximately 30 minutes to run an errand.  When she returned, the home was engulfed in flames.

5.5     Thereafter, based on the traumatic and catastrophic fire loss caused by the Subject Ranger 570, Plaintiff required hospitalization and significant treatment for a condition called Transient Global Amnesia.  Not only were the Subject Ranger 570, the home, and other personal property owned by Plaintiff destroyed, but Plaintiff also suffered serious personal injury.

**VI.**
**CLAIMS FOR RELIEF**

Count I – Violation of the Magnuson-Moss Warranty Act

6.1     Plaintiff repeats and re-alleges the foregoing paragraphs as if fully set forth herein.

6.2     This Court has jurisdiction to decide claims brought under 15 U.S.C. § 2301 by virtue of 28 U.S.C. §§ 1332(a) and (d).

6.3     Plaintiff is "consumer" within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(3).

6.4     Polaris is a "supplier" and "warrantor" within the meaning of the Magnuson- Moss Warranty Act, 15 U.S.C. § 2301(4)-(5).

6.5     The Vehicles are "consumer products" within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(1).

6.6     15 U.S.C. § 2310(d)(1) provides a cause of action for any consumer who is damaged by the failure of a warrantor to comply with a written warranty.

6.7     In its Limited Warranty, Polaris expressly warranted that it would repair or replace defects in material or workmanship free of charge if those defects became apparent during the warranty period.  Polaris provides the following language in the Subject Ranger 570's Owner's Manual:

> [Polaris] gives a SIX MONTH LIMITED WARRANTY on all components of the POLARIS RANGER against defects in material and workmanship…. This warranty covers the parts and labor charges for repair or replacement of defective parts which are covered by this warranty.  This warranty begins on the date or purchase.

6.8     Polaris's Limited Warranty is a written warranty within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(6).   The Vehicles' implied warranty of merchantability is covered by 15 U.S.C. § 2301(7).

6.9     With respect to Plaintiff's purchase of the Subject Ranger 570, the terms of Polaris's written warranty and implied warranty became part of the basis of the bargain between Polaris, on the one hand, and Plaintiff, on the other.

6.10    Polaris breached these warranties as described in more detail above.  Without limitation, the Subject Ranger 570 had an unreasonable propensity to catch fire, as described above.

6.11    Polaris was provided notice of these issues and defects through numerous complaints filed against it, as well as internal knowledge derived from testing and internal expert analysis.

6.12    At the time of sale of the Subject Ranger 570, Polaris knew, should have known, or was reckless in not knowing of the Subject Ranger 570's inability to perform as warranted, but nonetheless failed to rectify the situation and/or disclose the defective design. Under the circumstances, the remedies available under any informal settlement procedure would be inadequate, and any requirement that Plaintiff resort to an informal dispute resolution procedure and/or afford Polaris a reasonable opportunity to cure its breach of warranties is excused and thus should be deemed satisfied.

6.13    The amount in controversy of Plaintiff's individual claims meet or exceed the sum of $25.  The amount in controversy in this action exceeds the sum of $75,000, exclusive of interest and costs, computed on the basis of all claims to be determined in this lawsuit.

6.14    As a direct and proximate result of Polaris's breaches of its Limited Warranty and the implied warranty of merchantability, Plaintiff has sustained damages in an amount to be determined at trial.  Plaintiff seeks all damages permitted by law, including diminution in value of the Subject Ranger 570, in an amount to be proven at trial.

<u>Count II – Breach of Express Warranty</u>

6.15     Plaintiff repeats and re-alleges the foregoing paragraphs as if fully set forth herein.

6.16    Polaris Limited Warranty formed the basis of the bargain that was reached when Plaintiff purchased the Subject Ranger 570.

6.17    Polaris breached its express warranty to repair defects in materials and workmanship within the Class Vehicles.  Polaris has not repaired, and has been unable to repair, the Subject Ranger 570's materials and workmanship defects.

6.18    Polaris was provided notice of these issues and defects through numerous complaints filed against it, as well as internal knowledge derived from testing and internal expert analysis.

6.19    The Limited Warranty fails in its essential purpose because the contractual remedy is insufficient to make Plaintiff whole and because Polaris has failed and/or has refused to adequately provide the promised remedies within a reasonable time.

6.20    Accordingly, recovery by Plaintiff is not limited to the limited warranty of repair to parts defective in materials and workmanship, and Plaintiff seeks all remedies as allowed by law.

6.21    Also, as alleged in more detail herein, at the time that Polaris warranted and sold the Subject Ranger 570, it knew that the Subject Ranger 570 did not conform to the warranty and was inherently defective, and Polaris improperly concealed material facts regarding the Subject Ranger 570.   Plaintiff was therefore induced to purchase the Subject Ranger 570 under false pretenses.

6.22    Moreover, much of the damage flowing from the Subject Ranger 570 cannot be resolved through the limited remedy of repairs, as those incidental and consequential damages have already been suffered due to Polaris's improper conduct as alleged herein, and due to its failure and/or continued failure to provide such limited remedy within a reasonable time, and any limitation on Plaintiff's remedies would be insufficient to make her whole.

6.23    As a direct and proximate result of Polaris's breach of its express warranty, Plaintiff has been damaged in an amount to be determined at trial.

<u>Count III – Breach of Implied Warranty of Merchantability</u>

6.24    Plaintiff repeats and re-alleges the foregoing paragraphs as if fully set forth herein.

6.25    Polaris is and was at all relevant times a merchant with respect to motor vehicles under applicable law.

6.26    Pursuant to applicable law, a warranty that the Subject Ranger 570 was in merchantable condition was implied by law, and the Subject Ranger 570 was bought and sold subject to an implied warranty of merchantability.

6.27    The Subject Ranger 570 did not comply with the implied warranty of merchantability because, at the time of sale and at all times thereafter, it was defective and not in merchantable condition, would not pass without objection in the trade, and was not fit for the ordinary purpose for which vehicles were used.  Specifically, the Subject Ranger 570 suffers from the Engine Overheat/Fire Defect which causes the Subject Ranger 570 to have an unreasonable propensity to catch fire.

6.28    Polaris was provided notice of these issues and defects through numerous complaints filed against it, as well as internal knowledge derived from testing and internal expert analysis.

6.29    Plaintiff suffered injuries due to the defective nature of the Subject Ranger 570 and Polaris's breach of the warranty of merchantability.

6.30    As a direct and proximate result of Polaris's breach of the warranty of merchantability, Plaintiff has been damaged in an amount to be determined at trial.

<u>Count IV – Fraudulent Omission</u>

6.31    Plaintiff repeats and re-alleges the foregoing paragraphs as if fully set forth herein.

6.32    Polaris was aware of the Engine Overheat/Fire Defect within the Subject Ranger 570 when it marketed and sold the Subject Ranger 570 to Plaintiff.

6.33    Having been aware of the Engine Overheat/Fire Defect within the Subject Ranger 570, and having known that Plaintiff could not have reasonably been expected to know of the Engine Overheat/Fire Defect, Polaris had a duty to disclose the defect to Plaintiff in connection with the sale or lease of the Subject Ranger 570.

6.34    Polaris did not disclose the Engine Overheat/Fire Defect to Plaintiff in connection with the sale of the Subject Ranger 570.

6.35    For the reasons set forth above, the Engine Overheat/Fire Defect within the Subject Ranger 570 comprises material information with respect to the sale of the Subject Ranger 570.

6.36    In purchasing the Subject Ranger 570, Plaintiff relied on Polaris to disclose known material defects with respect to the Subject Ranger 570.

6.37    Had Plaintiff known of the Engine Overheat/Fire Defect within the Subject Ranger 570, she would not have purchased the Subject Ranger 570.

6.38    Through its omissions regarding the Engine Overheat/Fire Defect within the Subject Ranger 570, Polaris intended to induce, and did induce, Plaintiff to purchase the Subject Ranger 570 that she otherwise would not have purchased.

6.39    As a direct and proximate result of Polaris's omission, Plaintiff would not have purchased the Subject Ranger 570 if the Engine Overheat/Fire Defect had been disclosed to her, and, therefore, has incurred damages in an amount to be determined at trial.

<u>Count V – Unjust Enrichment</u>

6.40    Plaintiff repeats and re-alleges the foregoing paragraphs as if fully set forth herein.

6.41    Polaris has benefitted from selling at an unjust profit the defective Subject Ranger 570 that had an artificially inflated price due to Polaris's concealment of the Engine Overheat/Fire Defect, and Plaintiff has overpaid for this vehicle.

6.42    Polaris has received and retained unjust benefits from Plaintiff, and inequity has resulted.

6.43    It is inequitable and unconscionable for Polaris to retain these benefits.

6.44    Because Polaris concealed its fraud and deception, Plaintiff was not aware of the true facts concerning the Subject Ranger 570 and did not benefit from Polaris's misconduct.

6.45    Polaris knowingly accepted the unjust benefits of its wrongful conduct.

6.46    As a result of Polaris's misconduct, the amount of its unjust enrichment should be disgorged and returned to Plaintiff in an amount to be proven at trial.

<u>Count VI – Failure to Warn or Adequately Instruct under the MPLA</u>

6.47    Plaintiff repeats and re-alleges the foregoing paragraphs as if fully set forth herein.

6.48    At the time the Subject Ranger 570 left Polaris's control, Polaris knew or should have known about the danger presented by the Engine Overheat/Fire Defect.

6.49    The ordinary user/consumer of a 2014 Ranger 570 would not realize the dangerous condition presented by the Engine Overheat/Fire Defect.

6.50    The Engine Overheat/Fire Defect was not open and obvious.

6.51    No warning of the Engine Overheat/Fire Defect was provided to Plaintiff.

6.52    Polaris should have warned Plaintiff that the Subject Ranger 570 contained the Engine Overheat/Fire Defect, which was unreasonably dangerous.

6.53    As a result, Plaintiff was proximately damaged and is entitled to recover all damages allowable by law.

<u>Count VII – Failure to Warn or Adequately Instruct under the MPLA</u>

6.54    Plaintiff repeats and re-alleges the foregoing paragraphs as if fully set forth herein.

6.55    Polaris knew, or in light of reasonably available knowledge or in the exercise of reasonable care should have known, about the danger presented by the Engine Overheat/Fire Defect within the Subject Ranger 570, which proximately damaged Plaintiff.

6.56    As a result, the Subject Ranger 570 failed to function as expected.

6.57    Feasible alternative designs were readily available, as evidenced by the models of side-by-sides produced by Polaris prior to Polaris's introduction of the ProStar engine and differing design features accompanying the side-by-sides made by Polaris containing the ProStar engines, as well as the models produced thereafter that contained neither the ProStar engines nor the accompanying model design which together resulted in the Engine Overheat/Fire Defect, which was unreasonably dangerous.

6.58    Had such alternate design been utilized by Polaris, it is reasonably probable that the harm proximately caused to Plaintiff would have been prevented without impairing the utility, usefulness, practicality, or desirability of the of the Subject Ranger 570.

6.59    As a result, Plaintiff was proximately damaged and is entitled to recover all damages allowable by law.

## VIII.

## REQUEST FOR RELIEF

WHEREFORE, Plaintiff request a jury trial.  Plaintiff respectfully request that the Court enter judgment in her favor and against Defendants Polaris Industries, Inc. and Polaris Sales, Inc. as follows:

a.      Ordering Polaris Industries, Inc. and Polaris Sales, Inc. to pay actual and, where allowable by law, statutory damages, (including but not limited to punitive damages) and restitution to Plaintiff, as allowable by law;

b.      Ordering Polaris Industries, Inc. and Polaris Sales, Inc. to pay both pre- and post-judgment interest on any amounts awarded;

c.      Ordering Polaris Industries, Inc. and Polaris Sales, Inc. to pay attorneys' fees and costs of suit;

d.      Ordering Polaris Industries, Inc. and Polaris Sales, Inc. to pay any and all other damaged pled herein that are allowable by controlling law; and

e.      Ordering such other and further relief as may be just and proper.

THIS, the 31st day of January, 2022.

Respectfully submitted,

*/s/ John W. Nisbett*
John W. Nisbett
COUNSEL FOR CINDY CARROLL

OF COUNSEL:
Michael A. Heilman (MSB No. 2223)
John W. Nisbett (MSB No. 103120)
HEILMAN LAW GROUP, P.A.
Meadowbrook Office Park
4266 Plaintff-55 North, Suite 106
Jackson, Mississippi 39211

Telephone: (601) 914-1025
Facsimile:  (601) 944-2915
mheilman@heilmanlawgroup.com
jnisbett@heilmanlawgroup.com